IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BENJAMIN RITCHIE,<br>    Plaintiff,<br><br>vs.<br><br>LLOYD ARNOLD, Commissioner,<br>Indiana Department of Correction,<br><br><br>RON NEAL, Superintendent,<br>Indiana State Prison,<br><br>    Defendants. | Civil Case No. 25-932<br><br><br><br>**DEATH PENALTY CASE**<br><br>*EXECUTION SET FOR*<br>*May 20, 2025* |

**PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Benjamin Ritchie is scheduled to be executed before dawn on May 20, 2025. Pursuant to Federal Rule of Civil Procedure 65, Mr. Ritchie respectfully moves this Court for a Preliminary Injunction and a stay of execution to prevent the Defendants from executing Mr. Ritchie without first allowing him to receive Holy Communion and to confess to his spiritual advisor in confidence in the execution chamber. Executing Mr. Ritchie without permitting him to engage in these religious rituals will substantially burden the exercise of his religious beliefs as protected by the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc *et seq*, and violate his First Amendment right to the free exercise of religion.

**SUMMARY OF THE ARGUMENT**

Benjamin Ritchie is a lifelong Christian. From the age of eight or nine, counsel and guidance from spiritual advisors has been core to his faith. Mr. Ritchie believes that his

1

spiritual advisor's guidance—through prayer, touch, and the performance of end-of-life rituals—will be more important than ever as he seeks to reconcile with God before his death. Mr. Ritchie specifically seeks to have his spiritual advisor administer Holy Communion to him on his deathbed and to have his advisor take his confession in confidence shortly before the lethal injection chemicals are administered. These rituals are critical for Mr. Ritchie because he believes they will allow him to demonstrate his faith in God and commitment to spiritual redemption as he begins his journey in the afterlife. Defendants intend to execute Mr. Ritchie without accommodating his sincere religious beliefs. Absent this Court's intervention, Mr. Ritchie will be "unable to engage in protected religious exercise in the final moments of his life." *Ramirez v. Collier*, 595 U.S. 411, 434 (2022). Relief is necessary to ensure that Mr. Ritchie does not suffer irreversible spiritual harm.

## FACTUAL BACKGROUND

Christianity has been an important source of grounding and guidance for Mr. Ritchie for nearly his entire life. Particularly important to Mr. Ritchie have been his relationships with spiritual advisors, from whom he has sought counsel in all aspects of life. Mr. Ritchie began attending Sunday school at the Bible Church of Indianapolis when he was eight or nine years old and started going to his pastor, Thomas Simison, for one-on-one counseling shortly thereafter. Mr. Ritchie opened up to Pastor Simison about his problems in school, his troubled relationship with his birth mother, and his home life. Testimony of Thomas Simison, Post Conviction Tr. 713-716, Dec. 2, 2005.

With Pastor Simison, Mr. Ritchie deepened his understanding of and faith in the Christian tradition and in God. Over ten years after their first meeting, when Mr. Ritchie

was arrested for the shooting of Officer Toney, Pastor Simison went to visit Mr. Ritchie at the jail. At Mr. Ritchie's post-conviction hearing, Pastor Simison testified about that visit, recalling that "[w]hen they brought Ben in, the first thing he did was broke down and cried for a minute and asked me, he said 'Brother Simison, do you believe God will forgive me?'" *Id.* at 718.

Mr. Ritchie, now 45 years old, is the first to admit that in his 25 years on death row, he has at times felt disconnected from his faith. But he has consistently come back to prayer and the pursuit of God's forgiveness to ground himself. In 2015, Mr. Ritchie began visits with Minister Virgil Noble to explore his spirituality and the path to salvation. Those visits have taken on even greater significance for Mr. Ritchie as he prepares for his execution. Mr. Ritchie believes that in order to demonstrate his commitment to God before he dies, he needs his spiritual advisor by his side throughout his execution to pray over him and perform certain rites to guide his passage to the afterlife. Specifically, Mr. Ritchie seeks to prepare himself for death through prayer, confession, receiving Holy Communion, and receiving his spiritual advisor's touch throughout his execution.

The Christian tradition of clergy presence and ministry at the time of death derives from Jesus Christ's execution and ministry to the men being crucified alongside him. *See* Luke 23:42-43 (assuring the repentant criminal, "today you shall be with me in Paradise"). The presence of clergy at death remains a crucial Christian religious practice to the present day. "The presence of a priest or deacon shows more clearly that the Christian dies in communion with the church," and is "intended to help the dying person, if still conscious,

to face the natural human anxiety about death by imitating Christ in his patient suffering and dying."[1]

Mr. Ritchie desires his spiritual advisor's guidance as he seeks reconciliation with God in the final moments of his life. First, Mr. Ritchie wants his advisor to take confession in the chamber. "Individual and integral confession and absolution constitute the only ordinary means by which a member of the faithful conscious of grave sin is reconciled with God and the Church."[2] Mr. Ritchie adheres to the Christian belief that a person's dying moments are critical to salvation, and he believes that if he is not able to confess in those dying moments, he will carry the weight of mortal sin with him to his grave and will be unworthy of God's care in the afterlife. Mr. Ritchie further believes that in order to preserve the sanctity of his confession, it must occur in confidence. *See Trammel v. U.S.*, 445 U.S. 40, 51 (1980) ("The priest-penitent privilege recognizes the human need to disclose to a spiritual counselor, in total and absolute confidence, what are believed to be flawed acts or thoughts and to receive priestly consolation and guidance in return.").

Second, Mr. Ritchie wants to receive Holy Communion immediately prior to the administration of the lethal injection drugs. "Communion in the body and blood of Christ, received at this moment of 'passing over' to the Father, has a particular significance and importance."[3] The Eucharist at the time of death "is the seed of eternal life,"[4] and Mr.

---

[1] Liturgy Training Publications, *The Liturgy Documents Volume Two: Essential Documents for Parish Sacramental Rites and Other Liturgies* 228 (2d ed. 2012).
[2] 1983 Code c.960.
[3] Catechism of the Catholic Church: Revised in Accordance with the Official Latin Text Promulgated by Pope John Paul II, § 1524 (2d ed. 2019).
[4] *Id.*; *see also* John 6:54 ("Whoever eats my flesh and drinks my blood has eternal life, and I will raise him on the last day.").

Ritchie believes the Christian teaching that Holy Communion gives a dying person strength for the journey from this world to the afterlife.[5]

Third, Mr. Ritchie wishes for his spiritual advisor to audibly pray over him and lay hands on his head or hands in the moments before and after his death. "Both are traditional forms of religious exercise," *Ramirez*, 595 U.S. at 425, and both will allow Mr. Ritchie to be closer to God at the moment of his death.

Defendants' protocol for carrying out executions prohibits the presence of spiritual advisors in the execution chamber leading up to and at the time of death. Defendants' "Facility Directive ISP 06-26: Execution of a Death Sentence" states that a condemned individual may visit with their spiritual advisor until 10:00 PM the night preceding the execution. Mr. Ritchie's execution is scheduled to be carried out between midnight and sunrise on May 20, 2025. Mr. Ritchie made a written request for religious accommodation to Defendants' protocol. Specifically, he asked that his spiritual advisor be allowed in the execution chamber with him leading up to and during his execution and that his spiritual advisor be allowed to pray and conduct religious sacraments leading up to the execution.

Defendants responded that they would grant him the same accommodation as was granted in the last execution. The last execution in Indiana was that of Joseph Corcoran on December 18, 2024, and Mr. Corcoran was allowed to have his spiritual advisor present in the chamber and limited physical contact during the execution.[6] Defendants have failed to

---

[5] *See, e.g.,* Ministry with the Dying, *The Book of Common Prayer,* The Episcopal Church (1979); Ministry at the Time of Death, The Church of England, https://www.churchofengland.org/prayer-and-worship/worship-texts-and-resources/common-worship/death-and-dying/funeral#mm112.

[6] Casey Smith, *Death row inmate Joseph Corcoran executed for quadruple murder*, Indiana Capital Chronicle (Dec. 18, 2024), https://indianacapitalchronicle.com/2024/12/18/death-row-inmate-jospeh-corcoran-executed-for-quadruple-murder/.

offer any additional accommodation for Mr. Ritchie's specific beliefs, which require that he be administered Communion and have confession taken in confidence the execution chamber prior to his death. Mr. Ritchie will therefore be prevented from engaging in any and all of the practices he believes are critical to demonstrating his commitment to God as he seeks salvation in his dying moments.

## LEGAL STANDARD

To win a preliminary injunction, the moving party must show that "(1) it will suffer irreparable harm in the period before the resolution of its claim; (2) traditional legal remedies are inadequate; and (3) there is some likelihood of success on the merits of the claim." *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cnty. of Marion, Indiana*, 889 F.3d 432, 437 (7th Cir. 2018). If these threshold requirements are met, "the court moves to the balancing phase." *Id.* There, the court "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324 (7th Cir. 2015). The balancing phase "proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

The preliminary injunction analysis informs the analysis for issuance of a stay of execution. Specifically, "whether the inmate shows a significant probability of success on the merits" is a "critical factor" in evaluating whether a stay of execution is warranted. *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007) (citing *Hill v. McDonough,* 547 U.S. 573

(2006) and *Nelson v. Campbell*, 541 U.S. 637 (2004)). The second critical factor in this analysis is whether the inmate has delayed unnecessarily in bringing the claim. *Id.*

Granting a stay of execution along with a preliminary injunction is proper. *See Nken v. Holder*, 556 U.S. 418, 428–29 (2009) (distinguishing between a stay, which suspends the source of authority to act and "operates upon the judicial proceeding itself," and an injunction, which prohibits persons from taking any action because it "is directed at someone, and governs that party's conduct").

## ARGUMENT

Mr. Ritchie has a strong likelihood of success on the merits of his claims because absent this Court's intervention, Defendants' failure to allow his spiritual advisor to carry out the requested rituals will prohibit Mr. Ritchie from exercising his sincere religious beliefs in the final moments of his life. A stay of execution and preliminary injunction are appropriate.

### I. Mr. Ritchie has a strong likelihood of success on the merits of his RLUIPA claim.

RLUIPA forbids the government from imposing a substantial burden on a state prisoner's exercise of sincerely held religious beliefs unless the government can demonstrate that imposition of the burden advances a compelling governmental interest and is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc-1(a). Mr. Ritchie is likely to demonstrate that Defendants' refusal to grant the requested accommodations substantially burdens his exercise of his sincerely held religion. Defendants are unlikely to demonstrate any compelling governmental interest and, even if they do, are unlikely to demonstrate that banning the desired rituals is the least restrictive means of advancing their interest.

7

First, Mr. Ritchie's request for his spiritual advisor to be present and permitted to administer certain end-of-life rituals is "sincerely based on a religious belief." *Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015). Specifically, Mr. Ritchie's request is based on his belief that he must demonstrate his commitment to God in his dying moments to seek salvation and avoid sin as he dies. Belief in the power of God's forgiveness has been a critical part of Mr. Ritchie's faith since he first began seeking spiritual guidance from his childhood pastor over 35 years ago. Mr. Ritchie believes that confessing to his advisor in his final moments, receiving the Holy Communion immediately before his death, and having his spiritual advisor lay hands and pray over him immediately before and after his death are practices he must adhere to in order to reconcile with God.

Second, Defendants' refusal to grant the requested religious accommodation substantially burdens Mr. Ritchie's religious beliefs because it prevents him from practicing any and all religious rites in his dying moments. The rites Mr. Ritchie seeks to partake in—confession and Communion—are traditional components of ministry to dying Christians. Both are understood as important steps to take before death because death is not the end but rather the beginning of one's journey with God; shedding the weight of mortal sin and taking communion allow the dying person to leave this world knowing they are prepared for the journey to come. A burden that forces Mr. Ritchie to face death without the comfort of God's absolution and Communion is a substantial burden. Because Mr. Ritchie will succeed in meeting his threshold burden, "the burden flips and the government must 'demonstrate that imposition of the burden on [him]' is the least restrictive means of furthering a compelling governmental interest." *Ramirez*, 595 U.S. at 425. They will be unable to do this.

In denying Mr. Ritchie's request, Defendants have not provided any reason why they cannot accommodate his exercise of religion. The Supreme Court has considered multiple interests prison officials may have in limiting the presence and conduct of spiritual advisors in the execution chamber, such as: preserving the ability to monitor an execution, minimizing the "risk of interference during the delicate process of lethal injection," "preventing disruptions of any sort and maintaining solemnity and decorum in the execution chamber," and protecting those attending an execution. *Id*. at 429-433.

Even while recognizing that many of those interests are compelling, the Supreme Court held that the government cannot discharge its burden under RLUIPA "by pointing to 'broadly formulated interests.'" *Id*. at 427 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014)). It must instead show that the compelling interest is satisfied through application of the burden "'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 363 (citing *Hobby Lobby*, 573 U.S. at 726). For Defendants' failure to accommodate Mr. Ritchie to stand, they must therefore prove that there is something particular to denying Mr. Ritchie, or the accommodations he seeks, that advances a compelling governmental interest.

Whatever interest Defendants eventually assert, they will not meet this burden of proof. They will not be able to point to anything setting Mr. Ritchie (or the circumstances of his execution) apart from the many other condemned inmates across the country whose spiritual advisors were permitted to minister to them in various fashions in the execution chamber without issue.[7] *Cf. Ramirez*, 595 U.S. at 429 (Texas's assertion that

---

[7] *See e.g.,* Jimmy Jenkins, *Behind the Black Curtain: Republic Reporter Describes 'Surreal' Frank Atwood Execution*, The Arizona Republic (June 8, 2022), https://www.azcentral.com/story/news/local/arizona/2022/06/08/republic-reporter-

accommodations other states successfully offered were not "feasible" without exploring any relevant differences between process in Texas and in those other jurisdictions was "not enough under RLUIPA"). Nor will Defendants be able to show that there are no less restrictive ways to handle any concerns than to fully prohibit Mr. Ritchie's spiritual advisor from administering Communion and taking confession. *Cf. id.*, at 430 (listing reasonable restrictions prison officials might impose to address legitimate concerns, including, for example, requiring the advisor to undergo training and subjecting the advisor to removal for failure to comply with instructions).

Mr. Ritchie is likely to prevail on his claim that Defendants' protocol and their failure to grant him religious accommodations are inconsistent with his rights under RLUIPA.

## II. Mr. Ritchie has a strong likelihood of success on his claim under the Free Exercise Clause of the First Amendment.

Review of an incarcerated plaintiff's First Amendment claim is governed by the Supreme Court's decision in *Turner v. Safley*, 428 U.S. 78 (1987), which explained that "a prison regulation that impinges on inmates' constitutional rights is valid 'if it is reasonably related to legitimate penological interests.'" *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th

---

describes-witnessing-frank-atwood-arizona-execution/7561081001 (inmate's advisor placed a ceremonial cloth over inmate's head, held it in place with his hand throughout the execution, and leaned close to his face and spoke to him in hushed tones throughout); Khaleda Rahman, *Kosoul Chanthakoummane's Final Words Before Texas Execution*, Newsweek (Aug. 18, 2022), https://www.newsweek.com/kosoul-chanthakoummane-final-words-before-texas-execution-1734668 (spiritual advisor placed one hand on inmate's chest and read a passage from the Book of Ecclesiastes); John Simerman, *Jessie Hoffman's final moments inside Louisiana's execution chamber at Angola*, The Advocate (Mar. 19, 2025), https://www.nola.com/news/courts/jessie-hoffman-death-penalty-execution-nitrogen/article_4de95cb8-047c-11f0-91cc-d7c36246ff44.html (spiritual advisor knelt on a rug a few feet away from inmate and chanted throughout the execution).

10

Cir. 1991) (citing *Turner*, 428 U.S. at 89). The Seventh Circuit has created a four-part test for ascertaining the reasonableness of a prison regulation which impinges on constitutional rights based on *Turner*. The four factors are:

1. "whether a valid, rational connection exists between the regulation and a legitimate government interest behind the rule";

2. "whether there are alternative means of exercising the right in question that remain available to prisoners";

3. "the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources"; and

4. "although the regulation need not satisfy a least restrictive alternative test, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable."

*Al-Alamin,* 926 F.2d at 685 (citing *Williams v. Lane*, 851 F.2d 867, 877 (7th Cir. 1988)).

Defendants have not identified what legitimate government interest underlies their policy. Presumably, they will assert an interest in security, which the Seventh Circuit has validated as a legitimate penological demand. *Id*. at 686. But the existence of a penological interest does not give prison officials blanket authority to deprive inmates of their constitutional rights. "[I]ncarcerated persons retain a right to practice their religion to the extent that such practice is compatible with the legitimate penological demands of the state." *Id.* The manner in which Mr. Ritchie seeks to practice his religion does not undermine prison officials' administration of the prison or allocation of resources within the prison.

Mr. Ritchie's requests do not place the security of the prison at any increased risk. Many other states and the federal government allow clergy in the execution chamber, and Defendants will be unable to point to *any* instance where the presence or conduct of a clergy member has disturbed an execution or otherwise threatened security in the prison. *See Dunn*

11

*v. Smith*, 141 S. Ct. 725, 725-26 (2021) (Kagan, J., concurring in denial of application to vacate injunction of execution). Nor do Mr. Ritchie's requests require Defendants to redirect any prison resources to his execution other than those that are already provided for in the directive. Allowing Mr. Ritchie to exercise his religious beliefs in his dying moments will not negatively impact guards or other inmates.

As to the remaining factors, there are no alternative means for Mr. Ritchie to exercise his religious beliefs, and there are obvious, easy alternatives that would allow Mr. Ritchie to exercise his beliefs as he desires while minimizing any possible security risk. In light of the four factors the Seventh Circuit has drawn from *Turner*, Defendants' failure to accommodate Mr. Ritchie's religious exercise is not reasonable. "[The court's] task is to balance the plaintiffs' free exercise rights against the legitimate penological objectives of the defendants." *Young v. Lane*, 922 F.2d 370, 374 (7th Cir. 1991). Mr. Ritchie is likely to succeed in showing that Defendants' failure to accommodate his religious needs unreasonably impinges upon his free exercise rights in violation of the First Amendment.

### III. Traditional legal remedies are inadequate to protect Mr. Ritchie's rights to religious freedom.

The Seventh Circuit has found this factor to weigh in the plaintiff's favor where the plaintiff seeks a stay of execution and "has no adequate remedy at law." *Lambert v. Buss*, 498 U.S. 446, 452 (7th Cir. 2006).

The nature of Mr. Ritchie's claims, which allege spiritual harm, is such that there is no adequate traditional legal remedy. *See Ramirez*, 595 U.S. at 433 (deeming preliminary injunction appropriate in part because "compensation paid to [Ramirez's] estate would not remedy this harm, which is spiritual rather than pecuniary"); *Knowles v. Pfister*, 829 F.3d 516, 518 (7th Cir. 2016) (posing rhetorical question of what an adequate remedy at law

would be for First Amendment violation – "compensation for the loss of a religious entitlement?"); *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("The loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate.").

## IV.     Mr. Ritchie will suffer irreparable harm if he is executed before this case is resolved on the merits.

Mr. Ritchie faces an imminent and substantial threat of irreparable injury in the absence of injunctive relief "because he will be unable to engage in protected religious exercise in the final moments of his life." *Ramirez*, 595 U.S. at 433. "The loss of First Amendment freedoms unquestionably constitutes irreparable injury." *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (cleaned up). In the absence of a preliminary injunction, Mr. Ritchie will be forced to face his death without the comfort of knowing he has reconciled with God and received absolution before passing into the afterlife. Government interference with religious practice at the time of death is a quintessential irreparable injury.

## V.     The balance of harms favors granting relief.

When the moving party has shown a strong likelihood of success on the merits of a free exercise claim, the balance of harms carries little weight. *Korte*, 735 F.3d at 666 ("[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor.") (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)). The Seventh Circuit has extended this reasoning to a claim under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, because "although the claim is statutory, RFRA protects First Amendment free-exercise rights." *Id.* RLUIPA similarly—and even more robustly—protects the right to free exercise of religion, and Mr.

13

Ritchie's showing of likelihood of success on the merits therefore warrants preliminary injunctive relief. *Id.*

While the balance of the harms need not tip heavily in Mr. Ritchie's favor for relief to be granted, *Korte*, 735 F.3d at 665, it does so here. "Injunctions protecting First Amendment freedoms are always in the public interest." *ACLU of Ill.*, 679 F.3d at 590 (citing *Christian Legal Soc'y*, 453 F.3d at 859). The aim of the equitable balancing "is to minimize the costs of a wrong decision." *Id*. The costs of a wrong decision in this case are grave: if Mr. Ritchie's execution is carried out as scheduled, he will be robbed of his right to free exercise of religion in the critical moments leading to his death.

## CONCLUSION

Mr. Ritchie has shown a strong likelihood of success on the merits of his free exercise claims, that traditional legal remedies are inadequate, and that he will suffer irreparable harm if executed before his claims are resolved on the merits. Because he has met these threshold requirements and because the balance of harms weighs strongly in his favor, he respectfully requests that this Court grant the motion for a Preliminary Injunction to prevent the Defendants from carrying out his execution while violating his rights to engage in protected religious exercise.

Respectfully submitted,

/s/ Shawn Nolan
Shawn Nolan
Emilie Montgomery
Timothy Kane
Capital Habeas Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545W
Philadelphia, PA 19106

(215) 928-0520
shawn_nolan@fd.org
emilie_montgomery@fd.org
timothy_kane@fd.org

Dated: May 14, 2025  *Counsel for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2025, the foregoing was filed electronically with the Clerk of the Court for the United States District Court for the Southern District of Indiana by using the CM/ECF system. Service of this filing will be made on all ECF registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. Service has also been provided to counsel for Defendants, Adrienne Pope, adrienne.pope@atg.in.gov, Tyler G. Banks, tyler.banks@atg.in.gov, and Caroline Templeton, caroline.templeton@atg.in.gov, via electronic mail.

/s/ Shawn Nolan
Shawn Nolan